**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CLEAR CHANNEL OUTDOOR, LLC, | |
| *Plaintiff*, | Case No.  _____ |
| v. | **JURY TRIAL DEMANDED** |
| AAC SOUTH STATION PROPERTY, LLC, | |
| *Defendant*. | |

<u>**COMPLAINT**</u>

Plaintiff Clear Channel Outdoor, LLC ("Clear Channel"), by and through its undersigned attorneys, brings this action against AAC South Station Property, LLC ("AAC") and alleges as follows:

1.      Clear Channel and AAC are parties to the South Station Signage License Agreement (the "License Agreement"), which assigns to Clear Channel the "exclusive right to sell and display static, digital, and any other … commercial advertising signs … inside and on the exterior of or in the area outside" of Boston's South Station.  License Agreement (Ex. A) § 7. In exchange, Clear Channel is required to pay an annual licensing fee that is the greater of $500,000 (the minimum annual guarantee or "MAG") or 60% of net advertising revenue (the "Revenue Share").  *Id.* § 4.01.

2.      Since January 27, 2021, many of Clear Channel's advertising locations in South Station have been obscured, blocked entirely, or otherwise materially adversely affected by construction and renovation activity related to the South Station Air Rights Project, a planned multi-year expansion of South Station including a renovated rail and bus platform and a new, 51-story mixed-use tower atop the landmark station.

3.      As a result of this construction activity, Clear Channel's ability to sell advertising at South Station has been materially impaired—some advertising locations are entirely unsaleable, while others have been reduced in size or visibility to such an extent that Clear Channel can sell them for only a fraction of their pre-construction rate.  Upon information and belief, such obstructions are anticipated to continue through at least 2025.  This construction activity undermines Clear Channel's ability to fully realize the benefits of the License Agreement since, to obtain maximum revenue, advertising displays must be visible, uncluttered, and aesthetically appealing.

4.      Section 17.01 of the License Agreement deals specifically with the parties' respective rights and obligations in the event that such construction-related activity obscures, obstructs, or renders unusable any of Clear Channel's advertising displays.  In particular, the License Agreement provides that if *any* of Clear Channel's licensed advertising locations is unavailable or not visible for *any reason* for more than seven days, or if construction, scaffolding, or changes to the retail area of the station materially adversely affect Clear Channel's ability to sell any of its licensed advertising spaces, then Clear Channel's obligation to make MAG payments is suspended until such obstructions are removed.  Hence, so long as any of Clear Channel's advertising locations are inaccessible, less visible, or less attractive to advertisers, Clear Channel may withhold MAG payments and make only Revenue Share payments.  In addition, the License Agreement is automatically extended day-for-day so long as the advertising displays are materially adversely affected.

5.      Consistent with these clear provisions of the License Agreement, on April 19, 2021, Clear Channel notified AAC that it was invoking its rights under § 17.01 of the License Agreement to withhold MAG payments until South Station in general and Clear Channel's

licensed spaces in particular are returned to their pre-construction, non-obscured state.  After ignoring Clear Channel's notice for several months, AAC finally responded in August 2021, rejecting Clear Channel's claim and threatening to hold Clear Channel in default if it exercises its contractual right to withhold MAG payments.  Because the License Agreement requires Clear Channel to pay any disputed license fee until the dispute is resolved, Clear Channel has made over a half million dollars in MAG payments for the period during which the MAG should have been suspended.

6.      Clear Channel endeavored in good faith to resolve this matter without judicial intervention, but AAC has largely ignored those efforts except to make baseless threats of litigation and default to coerce Clear Channel to continue making full MAG payments. Accordingly, Clear Channel brings these claims for breach of contract and for declaratory relief, and asks the Court to enter judgment in Clear Channel's favor declaring the MAG to be unenforceable from January 22, 2021, until the construction-related obstructions at South Station are removed, and requiring disgorgement of all overpayments.

## PARTIES, JURISDICTION & VENUE

7.      Plaintiff Clear Channel is a limited liability company formed under the laws of the State of Delaware and a wholly owned subsidiary of Clear Channel Holdings, Inc. ("CCH"). CCH is a corporation formed under the laws of the State of Delaware with its principal place of business in San Antonio, Texas.  Accordingly, because a limited liability company assumes the citizenship of its owners for purposes of assessing diversity jurisdiction, Clear Channel is a citizen of the States of Delaware and Texas.

8.      Defendant AAC is a limited liability company that, upon information and belief, is a wholly owned subsidiary of Ashkenazy Acquisition Corp. ("Ashkenazy").  Ashkenazy is a

corporation formed under the laws of, and headquartered in, the State of New York. Accordingly, upon information and belief, AAC is a citizen of the State of New York.  AAC is, by assignment, a party to a 98-year ground license to manage the retail and commercial spaces at South Station (the "Ground License").

9.      Upon information and belief, AAC is entirely dominated by Ashkenazy, such that AAC is an alter ego of Ashkenazy and exists merely as a façade for Ashkenazy.  Upon information and belief, AAC has no employees (other than Ashkenazy employees carrying on AAC business), no physical address of its own (its principal office is Ashkenazy's address), and no online presence, and its funds are siphoned up to Ashkenazy.  While AAC is the party to both the Ground License and the License Agreement, Ashkenazy characterizes South Station as one of its "core assets" on its website and issued a press release declaring that it had "acquired the 98-year lease for the office and retail space at Boston's South Station."

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

### I.    The License Agreement

12.      A true and complete copy of the License Agreement is attached hereto as **Exhibit A**.

13.      The License Agreement, as amended, is a valid contract governed by the laws of the Commonwealth of Massachusetts.  *See* License Agreement (Ex. A) § 40.16.  Clear Channel has fully complied, and continues to fully comply, with all material terms of the License Agreement.

14.    The License Agreement was executed by EOP-South Station, LLC, and Blue Outdoor, LLC, on February 28, 2008.  Clear Channel (though its predecessor entity, Clear Channel, Inc.) acquired Blue Outdoor's interest by way of an Asset Purchase Agreement dated September 23, 2013.  In or about August 2017, AAC acquired EOP-South Station's interest in the License Agreement.

15.    The Initial Term of the License Agreement was ten years, through December 31, 2019, and has been extended an additional ten years, through December 31, 2029.  *See id.* §§ 1.01(D), (G), 34.

16.    The License Agreement grants Clear Channel "the exclusive right to sell and display static, digital and any other media form of, or newly developed technologies for, commercial advertising Signs now or hereafter used in the 'out of home' advertising industry both inside and on the exterior of or in the area outside the Building."  License Agreement § 7; *see id.* § 1.01(A) (defining "Building" to include "South Station Transportation Center Headhouse … and Licensor's leasehold estate in the land underlying the same and all easements, air rights, development rights and other appurtenances thereto").

17.    The License Agreement further defines certain "Licensed Spaces" where Clear Channel shall have the unobstructed right to sell and display advertising.  A true and complete inventory of Licensed Spaces for static advertising, as amended on December 7, 2012 (and excluding a separate inventory of licensed digital advertising locations), is attached hereto as **Exhibit B**.

18.    Each year, Clear Channel is required to pay a licensing fee equal to the greater of the MAG ($500,000 per year) or the Revenue Share (60% of Net Advertising Revenue).  License Agreement (Ex. A) § 4.01.  Thus, in effect, Clear Channel's license fee is $500,000 per year

unless Clear Channel's Net Advertising Revenue exceeds $833,333.33, in which case Clear Channel's license fee is 60% of Net Advertising Revenue.  Clear Channel is required to make monthly MAG installment payments, and each quarter is required to, as necessary, true up to the Revenue Share amount.  *Id.*

19.     Section 17.01 of the License Agreement sets forth the parties' rights, responsibilities, and protections in the event that construction or another specifically enumerated event impairs the visibility of any of the Licensed Spaces.  This provision contains three critical elements.

20.     *First*, § 17.01 waives any claim for damages, abatement, or release by Clear Channel against AAC in the event that:

> (i) portions of the retail area of the Building are temporarily closed or permanently closed, whether required by Law or otherwise,
>
> (ii) there is erected any scaffolding on the exterior of the Building for any reason whatsoever,
>
> (iii) any construction is being performed within the Building or outside of the Building or the construction of any building on the side of the Building facing the tracks which causes the normal traffic pattern of the public within the Building to be altered or causes less than five train head doors to be available for use on the south side of the Building leading to the track platform, whether such construction is caused by Licensor's own acts, or
>
> (iv) Licensor elects to reconfigure, redesign or renovate any portion of the retail area or the area leased by Licensor pursuant to the Ground Lease at the base of the escalators to the basement.

*Id.* § 17.01 (the "Liability Waiver Events") (line breaks added).

21.     *Second*, in exchange for this waiver of liability, the License Agreement provides that Clear Channel "shall not be obligated to pay the [MAG]" so long as any of the following three preconditions are met:

> a.     "the visibility of *any* of the Licensed Spaces is materially adversely impacted … *for any reason*";

b.        "*any* of the Licensed Spaces are unavailable or Unusable for more than seven (7) consecutive days *for any reason*"; or

c.        "Licensee's ability to sell advertising in *any* of the Licensed Area is materially impaired" by any of the Liability Waiver Events.

*Id.* (emphases added).  Where the MAG payments are suspended for less than a full calendar year, the MAG for that year "shall be proportionally reduced by the ratio that the actual period that such visibility is materially adversely impacted bears to three hundred sixty."  *Id.*  Where MAG payments are suspended for an entire calendar year, the MAG is $0 and Clear Channel is required to pay only Revenue Share.

22.     *Third*, the term of the license is automatically extended for a number of days equal to the number of days Clear Channel's Licensed Spaces were obstructed and MAG payments were suspended.  *Id.*; *see also id.* § 34 (stating that the "Extension Term shall constitute an extension of the initial Term and … may be extended pursuant to Article 17").

23.     The License Agreement entitles the prevailing party in any litigation to "all reasonable attorneys' fees, costs, and expenses."  *Id.* § 40.10.

## II.   The South Station Air Rights Project

24.     In 2016, the Boston Planning & Development Agency ("BDPA") approved the South Station Air Rights Project.  The Air Rights Project is a collaboration between BDPA, the Massachusetts Bay Transportation Authority ("MBTA"), and a private developer.

25.     Under its ground lease with the MBTA, which owns South Station, AAC agreed to "facilitate the completion and operation of" the tower project and to "act reasonably and in good faith" to ensure that the South Station Air Rights Project would be completed.  *See* Ground Lease, 3d Am. Vol. 2, § 35.  AAC is entitled to seek from MBTA "payment of fair compensation for the adverse impact (if any)" of the Air Rights Project.  *Id.*

26.     Construction began on the South Station Air Rights Project in January 2020. According to the developers, "[c]onstruction on the South Station Air Rights Project is expected to last 59 months," or roughly five years.  *See* South Station Air Rights, *Construction Schedule* (last visited Jan. 10, 2022), https://bit.ly/3047HhR.  This construction has caused "unprecedented" disruption to South Station visitors and riders.  *See* Adam Vaccaro, *It's Going to Be a Mess: South Station Riders Brace for Serious Disruption*, Boston Globe (Feb. 1, 2020), https://bit.ly/3DIfCjL; *see also, e.g.*, Catherine Carlock, *Here's How the South Station Air-Rights Tower Will Impact Your Commute*, Boston Business J. (Jan. 11, 2020), https://bit.ly/3drmwOr ("MBTA and the project's development team advise riders … to allow between five and 10 minutes of extra travel time to get to their platforms as passengers get used to construction zones.").

27.     As part of the Air Rights Project construction, certain of Clear Channel's Licensed Spaces were obstructed on or before January 27, 2021, and since that date, at least some of Clear Channel's Licensed Spaces have been continuously obstructed.  These obstructions have included walls, fencing, scaffolding, relocated tenant kiosks, and other equipment on and in the interior of the building, on the exterior of the building, and on the train platform.

28.     As just one example of the ongoing obstructions to the Licensed Spaces, Clear Channel has the right to sell and display advertising on the "Exterior Window Spectacular," which is defined in the License Agreement as five, sixteen-panel advertising spaces on the exterior of the station facing the train platform.



*See* Ex. B, at 20–25.

29.      The below image, which is incorporated into the License Agreement, depicts two

of the five sections of the Exterior Window Spectacular:



*Id.* at 20.

30.      The Exterior Window Spectacular is one of the most desirable advertising

locations, not just in South Station, but in the entire region, because it is conspicuously visible to

the millions of passengers who commute through the South Station each month.  Prior to

construction, the Exterior Window Spectacular generated over $400,000 in annual revenue, or

more than 16% of Clear Channel's total annual revenue at South Station.

31.     The Exterior Window Spectacular is designed for an advertiser to display large

messages across multiple display panels, as depicted in the following artist's rendering

incorporated into the License Agreement:



*Id.* at 25.

32.     Most of this display has been blocked off since January 27, 2021, and since at

least March 2021, 80% of this valuable advertising property has been completely covered up by

scaffolding, barriers, and other construction equipment erected as part of the South Station Air

Rights Project.  Today, four of the five sections (*i.e.*, 64 out of 80 panels) of the Exterior

Window Spectacular are entirely blocked off; the one remaining section cannot be seen from the

east side of the train platform due to the construction zone and is in a state of construction-

related disrepair.  Until recently, even that one remaining section of the display was covered by a

plexiglass barrier erected as part of the construction.  While that plexiglass barrier has since been

removed, exposed wires and loose insulation above and in front of the display continue to

diminish the visibility and attractiveness of the display; AAC has disregarded Clear Channel's

repeated requests to fix these issues.

33.     At all times since then and to this very day, the majority of the Exterior Window

Spectacular remains blocked, and the part that remains is materially less valuable to advertisers

because the display is reduced in size by 80%, is not visible from most of the train platforms, and

is surrounded by unattractive construction scaffolding, construction walls, exposed wiring, and loose insulation.

34.    The following images, taken in March 2021, depict the construction equipment obstructing visibility of and access to the Exterior Window Spectacular:




**March 1, 2021**                    **March 31, 2021**

35.    Similarly, the following images, taken on September 8, 2021, depict the construction walls obstructing the southeast exterior of the building.  These walls cover entirely all but one panel of the Exterior Window Spectacular:




36.    The following image, taken on January 6, 2022, depicts the current state of the one remaining accessible segment of the Exterior Window Spectacular, including the exposed wires and loose insulation that AAC has still failed to repair.  In an effort to demonstrate the

saleability of the display, Clear Channel has posted, at its own expense, Clear Channel advertising copy; however, the display remains unsold.



37.     This loss of both visibility and real estate materially impairs Clear Channel's ability to sell advertising on the Exterior Window Spectacular.  For the last full year prior to construction beginning (2019), the Exterior Window Spectacular was booked every month, generating an average of $34,300 in monthly revenue (exclusive of production costs, which are billed separately to advertisers).  Due to construction activity (as well as the uncertainty of what inventory would be available and AAC's unwillingness to help Clear Channel make even the remaining inventory presentable), Clear Channel was unable to sell the Exterior Window Spectacular for all of 2021, even at steeply reduced rates.

38.     Construction relating to the South Station Air Rights Project has also blocked off the majority of doors from the interior of the train station to the train platform.  As depicted in the below before-and-after images from the developer's website, a construction zone erected on the east side of the train platform has blocked at least seven of the ten pre-existing train head

doors, and all commuters are now funneled through five doors squeezed into the space originally occupied by no more than three train head doors:

 

*See* South Station Air Rights Project, *Passenger Experience During Construction* 5–6, https://bit.ly/3mSZwxT.

39.     To accommodate this new passenger flow, the developers have encouraged the use of ingress and egress routes that bypass the train station concourse altogether.

40.     As a result of these changes, fewer passengers and visitors actually enter South Station, materially adversely affecting Clear Channel's interior advertising inventory.  Similarly, because the passengers who do enter the station are now funneled through one-fifth of the platform, Clear Channel has been materially adversely affected in its ability to sell advertising above and around the closed train head doors.

41.     Because most of the train head doors are now closed, advertising locations on the inside of the station surrounding those doors are materially less valuable to advertisers.  Making matters worse, closed retail kiosks and roped-off equipment in that part of the station have made the eastern portion of the interior of the train station a virtual ghost town, as the following images from January 6, 2022 depict:





Because the interior advertising displays in this portion of the station are less visible, receive less foot traffic, and are less aesthetically appealing, Clear Channel has been materially adversely affected in its ability to sell advertising on these displays.

42.     As one final example, throughout the construction project, AAC has authorized repeated changes to the physical layout of the retail space of the station, resulting in obstructed sight views of Clear Channel's advertising displays and a generally cluttered appearance inside the train station.  Clear Channel has repeatedly asked AAC to provide floor plans for these reconfigurations and redesigns, but AAC has not done so.  As a result, Clear Channel has been unable to deploy its inventory in the manner that would allow it to maximize revenue.

### III.   Clear Channel Is Entitled to MAG Relief under § 17.01 of the License Agreement.

43.     The ongoing obstruction to the Licensed Spaces suspends Clear Channel's obligation to make MAG payments from January 27, 2021, until such a time as the obstructions are removed for each of the following, independent reasons.

44.     *First*, since at least January 27, 2021, the visibility of Clear Channel's Licensed Spaces, has been materially adversely impacted for more than seven consecutive days.  For example, four sections of the Exterior Window Spectacular are entirely blocked by walls and other construction equipment, and the one remaining section is no longer visible from most of the train platform.  In addition, construction work, scaffolding, and changes to the retail area and passenger flow have materially adversely impacted the visibility of certain interior Licensed Spaces.  Under the License Agreement, Clear Channel is entitled to MAG relief "if the visibility of *any* of the Licensed Spaces is materially adversely impacted … for more than seven (7) consecutive days for any reason."  License Agreement (Ex. A) § 17.01 (emphasis added).

45.     *Second*, since at least January 27, 2021, certain of Clear Channel's Licensed Spaces have been unavailable or unusable for more than seven consecutive days.  For example, 64 of the 80 panels of the Exterior Window Spectacular are unavailable for sale because they are blocked by scaffolding, construction walls, and other construction equipment, and the remaining 16 panels are no longer visible from the majority of the train platform.  In addition, Clear

Channel's ability to sell the remaining 16 panels has been materially adversely affected by plexiglass shields, exposed wires, and loose insulation that make it harder for Clear Channel to sell and install advertising copy and impossible to match the quality and attractiveness of pre-construction displays.  Under the License Agreement, Clear Channel is entitled to MAG relief if "any of the Licensed Spaces are unavailable or Unusable for more than seven (7) consecutive days for any reason."  *Id.*

46.     *Third*, since at least January 27, 2021, the partial closure of the retail area of the station; scaffolding on the exterior of the building; construction inside the building, outside of the building, and on the train platform; alterations to the traffic pattern; the closure of train head doors; and reconfigurations of and renovations to the retail space have materially adversely impacted Clear Channel's ability to sell advertising at South Station.  As a consequence of the construction, a substantial portion of the retail space of the train station is effectively unused and the majority of the pre-construction train head doors have been closed, materially adversely affecting the value of advertising in those locations.  Relatedly, kiosks in the retail space of the train station has been relocated, limiting the visibility of many of Clear Channel's interior advertisements—and because AAC has been unwilling to keep Clear Channel abreast of such reconfigurations, Clear Channel has been unable to restage its inventory.  In addition, construction inside, on the exterior of, and outside of the station have reduced the visibility and saleability of Clear Channel's licensed spaces, changed the traffic flow on and to the platform, and resulted in the closure of seven of the ten original train head doors.  Compared with 2019 (the last year of pre-construction revenue), Clear Channel's net advertising revenue at South Station is down 92%.  As a result, Clear Channel is projected to earn just $199,032 in net advertising revenue at South Station for 2021 (compared with nearly $2.5 million in 2019) while

still paying $500,000 in MAG to AAC, meaning that Clear Channel has been forced to pay an

effective revenue share of 251%.  Under the License Agreement, Clear Channel is entitled to

MAG relief if its "ability to sell advertising in any of the Licensed Area is materially impaired"

because

> (i) portions of the retail area of the Building are temporarily closed or permanently closed, whether required by Law or otherwise, (ii) there is erected any scaffolding on the exterior of the Building <u>for any reason whatsoever</u>, (iii) any construction is being performed within the Building or outside of the Building or the construction of any building on the side of the Building facing the tracks which causes the normal traffic pattern of the public within the Building to be altered or causes less than five train head doors to be available for use on the south side of the Building leading to the track platform, <u>whether such construction is caused by Licensor's own acts</u>, or (iv) Licensor elects to reconfigure, redesign or renovate any portion of the retail area or the area leased by Licensor pursuant to the Ground Lease at the base of the escalators to the basement

*Id.* (emphases added).

47.     The License Agreement includes a precise formula for calculating reductions in

MAG due to events covered by § 17.01:

> The Guaranteed Minimum License Fee shall be proportionately reduced by the ratio that the actual period that such visibility is materially adversely impacted bears to three hundred sixty (360). For example, if the visibility of the all or a portion of the Licensed Area is materially adversely impacted for sixty (60) days at any time during the Term, the Guaranteed Minimum License Fee for such License Year shall be reduced by 60/360 or sixty thousand ($60,000.00).

*Id.*

48.     Applying this formula to the facts of this case, for 2021, Clear Channel's

Licensed Spaces were obstructed continuously from January 27, 2021 through the end of the

year; therefore, Clear Channel's MAG obligation is reduced to $29,166.67.[*]  Clear Channel's

revenue share obligation (60% of $199,032) is $119,419.20, and because it exceeds MAG,

---

[*] Clear Channel's advertising locations were blocked for 339 days in 2021.  Therefore, Clear Channel's MAG for 2021 was reduced by 339/360, or $470,833.33.

represents Clear Channel's entire financial obligation to AAC for 2021. Instead, AAC has demanded that Clear Channel pay the full $500,000 MAG for the year. Clear Channel is entitled to a refund or credit of the MAG it paid less the $119,419.20 in revenue share it actually owed (*i.e.*, a refund or credit of $380,580.80). *See id.* §§ 17.01, 40.02.

49.     Until Clear Channel's Licensed Spaces are no longer obstructed, Clear Channel is entitled to pay only quarterly installments of 60% of revenue, because its MAG obligation will be $0.

50.     Finally, for each day MAG is suspended, the License Agreement is extended an additional date.

**IV.     AAC Disregards Clear Channel's Right to MAG Relief.**

51.     Clear Channel raised concerns with construction-related obstructions to the Licensed Spaces shortly after the Licensed Spaces first became obstructed on January 27, 2021.

52.     Clear Channel served Ashkenazy and AAC with formal, written notice of its right to suspend MAG payments for the duration of construction-related obstructions on April 19, 2021.

53.     AAC did not respond to Clear Channel's notice until August 2021.

54.     In its response, AAC threatened to hold Clear Channel in material breach and terminate the License Agreement if Clear Channel withheld MAG payments. Accordingly, Clear Channel has timely made MAG installment payments every month.

55.     Since then, Clear Channel and an employee of Ashkenazy, as a representative of AAC, have had multiple conversations about ways to resolve this dispute without judicial intervention, but AAC has ignored Clear Channel's proposals. Clear Channel also requested information or repairs that would improve the saleability of the advertising locations, which AAC also ignored.

56.     Clear Channel has endeavored in good faith to reach a resolution with AAC, but AAC has rejected and largely ignored those efforts.

### CAUSES OF ACTION

### COUNT I
**Breach of Contract**

57.     Clear Channel incorporates the preceding paragraphs as though fully set forth herein.

58.     Construction activity relating to the South Station Air Rights Project—including closure and renovation of the retail area, the erection of scaffolding, interior and exterior construction, and changes to the passenger flow—has (1) materially adversely affected the visibility of one or more of the Licensed Spaces since January 27, 2021; (2) made one or more of the Licensed Spaces unavailable or unusable since January 27, 2021; and (3) materially impaired Clear Channel's ability to sell advertising in the Licensed Spaces.

59.     Based on the foregoing, Clear Channel is entitled to reduce its MAG payments in an amount proportional to the duration of these obstructions and to an extension of the License Agreement for a number of days equal to the number of days MAG payments are reduced.

60.     AAC has refused to recognize or honor Clear Channel's right to MAG relief or to an extension of the License Agreement.

61.     Clear Channel is therefore entitled to the relief prayed for below.

### COUNT II
**Declaratory Judgment (28 U.S.C. § 2201)**

62.     Clear Channel incorporates the preceding paragraphs as though fully set forth herein.

63.     There is a ripe dispute between Clear Channel and AAC regarding the parties' respective rights under the License Agreement, including specifically Clear Channel's obligation to make MAG payments under § 17.01 of that Agreement.

64.     Construction activity relating to the South Station Air Rights Project—including closure and renovation of the retail area, the erection of scaffolding, interior and exterior construction, and changes to the passenger flow—has (1) materially adversely affected the visibility of one or more of the Licensed Spaces since January 27, 2021; (2) made one or more of the Licensed Spaces unavailable or unusable since January 27, 2021; and (3) materially impaired Clear Channel's ability to sell advertising in the Licensed Spaces.

65.     Under § 17.01 of the License Agreement, Clear Channel is not obligated to make MAG payments so long as the above obstructions remain and the term of the License Agreement is extended for an equal number of days.  However, because the License Agreement requires Clear Channel to make any disputed payments and because AAC has refused to acknowledge Clear Channel's rights under § 17.01, Clear Channel's only option is judgment from this Court declaring the parties' respective rights and obligations.

66.     Clear Channel is therefore entitled to the relief prayed for below.

## PRAYER FOR RELIEF

Clear Channel demands judgment on AAC and further requests the following relief as appropriate:

A.     Declare that (1) AAC has breached the License Agreement; (2) Clear Channel is entitled to a refund of MAG payments from January 27, 2021, until the date of judgment, and is not required to make MAG payments until such a time as the material adverse effects just

described are entirely abated; and (3) the License Agreement shall be extended for a number of days equal to the period that MAG payments are suspended;

B.     Order AAC to disgorge, refund, or credit all payments in excess of the adjusted license fee (*i.e.*, the greater of the proportionally reduced MAG and the Revenue Share), along with pre- and post-judgment interest;

C.     Enjoin AAC and its directors, officers, employees, and agents from demanding Clear Channel to make any payments in excess of the adjusted license fee until completion of the South Station Air Rights Project;

D.     Award compensatory, consequential, and nominal damages in an amount to be proven at trial;

E.     Award attorneys' fees and costs as authorized by the License Agreement and to the extent otherwise permitted by law; and

F.     Enter such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMAND</u>

Clear Channel demands a trial by jury on all issues and claims so properly triable.

January 11, 2022

Respectfully submitted,

/s/ *Jack W. Pirozzolo*

| | |
|---|---|
| Gordon D. Todd* | Jack W. Pirozzolo (BBO# 564879) |
| Daniel J. Hay* | Sidley Austin LLP |
| Jeremy D. Rozansky* | 60 State Street, 36th Floor |
| Sidley Austin LLP | Boston, MA 02109 |
| 1501 K Street, N.W. | Tel.: (617) 223-0304 |
| Washington, D.C. 20005 | Fax: (617) 223-0301 |
| Tel.: (202) 736-8000 | jpirozzolo@sidley.com |
| Fax: (202) 736-8711 | |
| gtodd@sidley.com | |
| dhay@sidley.com | |
| jrozansky@sidley.com | |

* *pro hac vice* forthcoming

*Counsel for Clear Channel Outdoor, LLC*